[Civ. No. 13952. First Dist., Div. One. Mar. 25, 1949.]

ARTHUR B. DAVIDSON, Respondent, v. GLENN MARTIN DAVIDSON, Appellant.

810

Lucille F. Athearn and Fred G. Athearn for Appellant.

R. P. Wisecarver and James F. Hoey for Respondent.

PETERS, P. J.—On August 12, 1947, respondent secured an uncontested interlocutory decree of divorce from his wife on the ground of extreme cruelty. About five and one-half months later, on January 27, 1948, appellant filed a notice of motion under section 473 of the Code of Civil Procedure to set aside the interlocutory decree and the property settlement agreement, which had been approved by the court in the divorce action, contending that the decree was taken against her through her mistake, inadvertence, surprise or excusable neglect; that it was secured by means of extrinsic fraud, threats, coercion, duress and undue influence; that the property settlement agreement was secured by threats, fraud, duress and undue influence, and requesting that, upon setting aside the interlocutory decree, she be permitted to file a verified amended answer and cross-complaint. Various affidavits were filed, a hearing had, and briefs filed. The trial court denied the motion, and from that order of denial the wife appeals.

These parties have been married for over 25 years. They have two children, an adult married son, and a daughter, aged 20, attending the University.

The divorce action was filed by respondent on August 9, 1947. On August 11, 1947, the appellant signed an answer *in propria persona*, generally denying all of the allegations of the complaint. This answer was drafted by the attorney for the respondent. On this same date the appellant also signed a waiver of notice of the time and place of trial which had been prepared by respondent's attorney. The answer was filed on August 12, 1947, and on that same day the divorce action was heard and decided by the same judge that decided the motion here involved. At the divorce hearing the appellant did not appear. The divorce was granted on the testimony of the respondent and of the adult son of the parties.

The property settlement agreement, which was drafted by respondent's attorney after several conferences with the respondent and appellant and the children, provided that the home of the parties, valued at over $30,000, is to remain in joint tenancy, with appellant having the right of possession for life. Respondent agreed to pay off the existing indebtedness on the house, which he has since done. He also agreed to pay all taxes on the house and to pay for all needed repairs. With certain minor exceptions, the furniture and personal effects, valued at $8,000, were awarded to appellant. Respond-

ent received the family automobile, valued at $2,000. Appellant received $4,700 in bonds, which includes a little over $2,000 of bonds that were her separate property, all other bonds being community property. The husband received $2,250 in bonds. There were two life insurance policies. The agreement provided that appellant was to remain beneficiary of a $5,000 policy that had no cash value, and the respondent was to have full title to the other policy which he has since cashed in for $2,856.65. Five thousand shares of stock in the company with which he was associated, which had been given respondent by the president of that company and endorsed back to the company pursuant to an agreement that the company should retain them if respondent died or left the firm, the company agreeing to pay $1.50 a share in the event of the happening of either contingency, were retained by the respondent. The bank accounts in an undisclosed sum went to respondent. Respondent further agreed to pay to appellant $400 per month alimony during the life of appellant or until she remarries, and, in addition, to pay his daughter not less than $100 per month to enable her to finish her college education.

The theory of appellant is that, because of a prior illness, she was emotionally unbalanced at the time of the divorce and when she signed the waiver and answer; that she was misled by respondent and his attorney into the belief that she could not prevent the divorce; that she was told that the entire assets of the parties would be consumed by the expenses of litigation if she contested the divorce; that she was discouraged from securing the services of an attorney and had no independent legal advice during the negotiations; that the divorce proceedings were rushed through so rapidly that she was unable to secure legal advice as to her rights; that respondent closed out their joint bank account so that she was without funds to employ an attorney; that respondent threatened her with publicity and notoriety unless she consented to the granting of the divorce; that respondent's attorney represented both parties to the action; that this was unethical and fraudulent; that for these reasons she is entitled to have the divorce decree and property settlement set aside.

Respondent contends, and his evidence supports the contentions, that appellant was in full possession of her faculties at the time of the divorce and fully understood and agreed to everything that was done; that she was not represented by counsel because she did not want an attorney; that she did

not want to discuss the matter with anyone but respondent's attorney and the family; that his attorney repeatedly requested her to employ independent counsel, but that she refused to do so; that at all times prior to the entry of the decree the joint bank account of the parties was available to appellant for the hiring of counsel; that the rapidity of the divorce was occasioned by his desire to return to Los Angeles where he is manager of the office; that at no time did he threaten or coerce his wife, but merely told her that he intended to have a divorce even if he had to go to Reno to get it; that appellant was completely satisfied with the entire transaction until she learned he was keeping company with another woman, when she decided to start this proceeding to punish and harass him.

As might be expected in such a proceeding, the evidence is highly conflicting. There can be no doubt that the evidence introduced at the time of the divorce proceeding and the evidence introduced on this proceeding amply support the conclusion that respondent was entitled to a divorce. The evidence of respondent and his witnesses is to the effect that, from almost the very inception of the marriage, appellant has been a nagging and fault-finding wife, has refused to permit members of respondent's family to visit the home, and since 1937 has refused to have marital relations with her husband. In both proceedings there is ample evidence to support the finding of extreme cruelty. That is, of course, not the issue here presented. In the instant proceeding we are solely interested in whether the trial court abused its discretion in refusing to set the divorce decree aside. The real issues are whether appellant knew what was happening at the time of the divorce, or whether she was so emotionally upset that she was unable to comprehend what was going on, whether respondent and his attorney took unfair advantage of appellant, and whether the divorce was secured by fraud. These are all factual matters on which the evidence was conflicting. The trial judge saw these parties and heard them testify. He has seen fit to believe respondent and his witnesses and to disbelieve appellant. This being so, there was no abuse of discretion in denying the motion.

The evidence was directly conflicting as to the health and mental condition of appellant in August, 1947. In 1945, she had had a stroke which, for a short time, rendered her unable to walk or to speak. She claimed that, as a result of this con-

dition, she is subject to great emotional disturbances and is easily upset mentally and emotionally; that she is frequently unable to understand the significance of matters presented to her, and that she was in such a condition in August, 1947, and did not then understand the effect of the property settlement and other papers signed by her. This evidence is directly refuted by respondent, his attorney and by the surrounding circumstances. In June and July of 1947 appellant and her daughter took a five-week trip to the East and to Canada. On this trip she was most active, far more so than her 20-year-old daughter. Respondent and his attorney both testified that she was in good physical and mental condition during the time in question.

That she fully understood the property settlement is evidenced by the fact that it was she who suggested the $400 per month alimony allowance and the $100 allowance for the daughter, and that at her request the tentative agreement was changed in several material respects.

Nor was any coercion, fraud or undue influence practiced by respondent or his attorney. On July 29, 1947, respondent told appellant that he wanted a divorce. After an unsuccessful attempt by appellant to dissuade respondent from seeking a divorce, respondent told appellant that he was going to invite his attorney, an old friend of the family, to the house to discuss the property settlement and other matters. Such a meeting was held shortly thereafter. It was attended by the respondent, appellant, the attorney, and by the two children. The evidence was highly conflicting as to what there occurred. We are, of course, bound by any substantial evidence that supports the implied findings of the trial court. Respondent and his attorney testified that appellant had computed her estimated expenses and suggested $400 a month alimony. After this had been agreed upon, respondent agreed to pay an additional $100 a month to the daughter while she is in college. That this was a reasonable and fair allowance is apparent. Respondent's salary is about $12,600 a year, which, after taxes, leaves him with about $835 a month take-home pay. In 1947, he received about $6,000 in bonuses and dividends on which the tax was about 35 per cent. The other provisions of the property settlement have already been summarized. They are obviously fair to appellant.

Appellant suggested various material changes in the tentative agreement, and these were made. Appellant, nevertheless, contends that she was not consulted about anything, but

merely was told what she would get. This conflict has been resolved against her, and is binding on this court.

Appellant testified that she was coerced into agreeing to an uncontested divorce by respondent's threats that a contested divorce would ruin the family financially, and that, in that event, she would get nothing. She also testified that she told respondent and his attorney that she wanted to see the judge and talk the matter over with him, but was told by both that this could not be done. She also testified that she was told by respondent that the joint checking account was closed, and that she therefore believed she had no money to hire an attorney, and that the attorney told her that it would be futile to get independent counsel. In almost every particular this evidence was directly contradicted by respondent and his attorney. Respondent admitted that he told appellant that he was determined to get a divorce even if he had to go to Reno. He denied telling her that the joint bank account was closed, testifying that he did not tell her that until after the interlocutory decree was secured. The joint account was available to her and she could have drawn on it had she so desired. Both respondent and the attorney testified that the attorney repeatedly requested appellant to get an attorney, but that she refused, stating that she did not want to talk to anyone outside the family about the divorce. All of these conflicts have been resolved against appellant by the trial court, and its determination is binding on this court.

After these conferences, the attorney drew up the property settlement, and delivered it to the Davidsons. Appellant testified that on the morning of August 8th her husband simply told her to sign it and that she did so without reading it or knowing its contents. Her daughter witnessed her signature. Both the daughter and appellant testified that the attorney was not then present. Appellant testified that she was under a great emotional strain, and signed simply because "it seemed the easiest way out." She was positive that the settlement agreement was not read to or by her before she signed it. This evidence was directly contradicted by respondent and his attorney. Both testified that it was read to or by appellant before she signed it. The attorney testified in detail as to the circumstances of this meeting. This conflict was resolved against appellant by the trial court, and its determination is binding on this court.

The attorney likewise, at this meeting, discussed with appellant the differences between a default, and answering and

waiving notice of time and place of the hearing. Appellant quite definitely indicated that she did not desire to contest the divorce, and when the attorney left it was definitely understood by all concerned that he should draw up the papers so that the decree could be secured as quickly and quietly as possible.

On August 9, 1947, the complaint, charging cruelty and desertion was filed. On August 11, 1947, pursuant to an appointment made prior thereto, the attorney called upon appellant and served her with the complaint and summons. At the same interview he presented to her a proposed answer, *in propria persona,* and a waiver of notice of time and place of trial. These documents, according to the attorney, were read through by appellant and some of the provisions discussed and explained. Again he suggested that she get an attorney, but again she was positive in her refusal. At this same meeting, according to the attorney, appellant suggested certain further changes in the property settlement, and they were made. Appellant then expressed a willingness to sign the answer and waiver, and the attorney telephoned to make arrangements with a notary.

Appellant contradicted this testimony. She denied that the attorney suggested that she get counsel of her own choice. She testified that she was "emotionally upset" and "hurried all the time," and that she did not read the papers and did not understand them.

The attorney then took the appellant to the home of the notary where appellant admittedly signed the answer and waiver. The attorney testified that, in the presence of appellant, he told the notary that appellant did not wish to contest the divorce and did not want an attorney, and requested the notary not to mention the matter to anyone. This was corroborated by the affidavit of the notary. Appellant contradicted most of this testimony, but this conflict again was resolved against appellant by the trial court.

It is also urged that the adult married son of the parties, who was respondent's corroborating witness at the divorce hearing, was coerced into testifying. He testified that he was falsely informed by respondent and the attorney that his mother knew that he was going to testify at the divorce hearing, and that he would not have testified had he known she was unaware of his appearance; that he certainly would not have testified had he known his father was keeping company with another woman; that the attorney presented him

with a list of questions and told him to answer "yes" or "no," and to offer no explanations; that the attorney told him that any attempt to explain his answers would result in his being held in contempt of court. He admitted, however, that every word of his testimony given on the divorce hearing was true "as far as it went." An examination of the transcript of that hearing shows that most of the important questions were asked by the trial judge, and were not answered "yes" or "no," explanations being given by the witness to most of them. The attorney testified that he told the son that he should not take sides in the case; that his mother did not desire publicity and wanted to keep the entire matter within the family, so far as possible; that if the son could testify as to the facts it would be unnecessary to call in any outside witness; that he did not tell the son that the mother knew he was to testify, and did not tell him to answer "yes" or "no," or how to answer the questions; that he did not threaten that the judge would hold the son in contempt if he tried to explain his answers. These conflicts have been resolved against appellant by the trial court, and cannot be retried in this court.

Immediately after the decree was entered appellant received a copy. She made no objections of any kind for about five and one-half months. She testified that she became dissatisfied with the divorce decree and property settlement after talking to a San Francisco judge; that the judge had heard about the case from a neighbor and telephoned to her; that the judge told her that the case constituted a most glaring miscarriage of justice, and recommended that she get a lawyer; that the judge told her that she was not protected, and that it was her duty to protect herself and her children. The affidavit of the judge contradicts this story in several material respects. It is there averred that, while attending a dinner party, the hostess stated that she had a friend who was disturbed about her divorce; that the hostess then telephoned this friend and asked the judge to talk to her; that the judge, who had no knowledge of any of the facts, and so avers, then simply told the appellant that if she was dissatisfied she should seek the advice of an attorney who could tell her whether or not the interlocutory decree had been properly secured.

It is quite apparent that the problems here involved are primarily factual, and that in nearly every material respect the trial court has seen fit to believe respondent and his wit-

nesses and to disbelieve appellant and her witnesses. Insofar as the case involves conflicts in the evidence, this court has no power to interfere. So far as the facts are concerned, we are faced with a record that shows that over the years this appellant has been guilty of extreme cruelty to her husband; that he finally determined to get a divorce, contested or uncontested; that he made an offer of a fair property settlement; that she agreed to it; that she did not desire to contest the divorce; that although she had available funds to hire an attorney, and although the attorney for the respondent repeatedly urged her to get an attorney, she refused to get one; and that she understood everything she was doing.

■ This is not a case where one party to a divorce has been deprived of a fair share of community property by a property agreement, a factor that would be most important in determining whether to set aside an uncontested decree and property settlement. Without regard to the fact that the divorce decree establishes that appellant was guilty of cruelty, an examination of the property settlement demonstrates its fairness. Appellant secured a joint tenancy interest in the home, the right to possession for life, and respondent agreed to assume the indebtedness against the house, and to pay all the taxes and repairs. The wife got all the furniture. The community property bonds were about evenly divided. The insurance policies were divided, the respondent getting the one with a cash value, and also getting the automobile, the bank accounts and the stock. But he has agreed to pay appellant $400 a month for life or until she remarries, plus $100 a month to his daughter while she is in college. The agreement was quite fair to appellant.

■ Faced with the fact that on every major issue made there is a substantial conflict in the evidence, appellant urges that it was extrinsic fraud and unethical conduct, as a matter of law, for the attorney for respondent to have discussed the divorce with appellant, and to have prepared the answer and waiver for her. In the briefs, and at the oral argument, the attorney for appellant has bitterly assailed and condemned the attorney for respondent for what she terms his unethical and fraudulent conduct. Such conduct, she asserts, prohibited appellant from presenting her case and prohibited a fair hearing of the issues. After asserting that such conduct constitutes extrinsic fraud, the frequently cited case of *United States* v. *Throckmorton,* 98 U.S. 61 [25 L.Ed. 93], is relied upon, to establish the point that such extrinsic fraud war-

rants setting a judgment aside. Of course it is not and should not be the law that conduct such as is here involved, as a matter of law, constitutes extrinsic fraud. It is not the law that an attorney for one of the parties in a divorce proceeding may not discuss a proposed property settlement with the other party to the action, where that other party is advised that she should get an attorney, but is adamant in her refusal to do so. It is, of course, much better for all concerned if both sides have independent counsel, but there is no way by which a litigant can be compelled to secure an attorney. Where the attorney for one of the parties is compelled to deal directly with the other litigant he is under a most strict duty to deal with such litigant fairly and objectively, and the agreement will be scrutinized most carefully to be sure that there has been no overreaching. The evidence in the present case supports the trial court's implied finding that counsel for respondent scrupulously observed the proprieties in all respects, and in no way took advantage of the fact that appellant was unrepresented by counsel. Appellant received as much, or more, out of the agreement as she would have received had she had an attorney. ■ Nor was it unethical conduct, as a matter of law, for the attorney for respondent, after the property settlement had been agreed upon, and after appellant had definitely and positively stated on several occasions that she did not wish to contest the divorce and would not contest it, to tell her that she could either default or answer and waive notice, and to have prepared for her the answer and waiver. This attorney was an old friend of the family. At the time, appellant was desirous of keeping the entire proceedings quiet and within the knowledge of as few people as possible. The evidence supports the implied finding that what was done by the attorney was done in exact accord with appellant's desires and with a full understanding on her part of what she was doing. Judicial decrees cannot and should not be set aside simply because one of the litigants changes her mind. The attack made upon counsel for respondent by the counsel for appellant is unjustified and legally unsound.

The order appealed from is affirmed.

Ward, J., and Bray, J., concurred.